LINSELL v APPLIED HANDLING, INC

Docket No. 249647. Submitted January 18, 2005, at Detroit. Decided
    February 8, 2005. Approved for publication April 19, 2005, at 9:00
    a.m.

    Mary Anne Linsell brought an action in the Wayne Circuit Court
    against Applied Handling, Inc., to recover unpaid sales commis-
    sions. The jury found that the parties had an oral contract
    requiring the defendant to pay the plaintiff commissions on sales
    before and after she resigned, and that the defendant breached the
    contract. The jury awarded the plaintiff $498,500 for the breach of
    contract, and penalties under the sales representative commis-
    sions act, MCL 600.2961, in the amount of $576,000. The court,
    Daphne Curtis Means, J., denied the defendant's motions for new
    trial, judgment notwithstanding the verdict, and remittitur. The
    defendant appealed. The plaintiff cross-appealed, challenging the
    amount awarded as penalties under MCL 600.2961.

    The Court of Appeals held:

    1. The parties agreed there was an oral contract for employ-
    ment, and the dispute concerned its terms. When the terms of a
    contract are contested, the actual terms are to be determined by
    the jury. Moreover, a review of the record indicates that the
    plaintiff's claim included preresignation commissions. Given the
    jury's finding that there was an agreement, the defendant's
    arguments on appeal concerning a lack of support for the verdict
    under the "procuring cause doctrine" and various equitable theo-
    ries are misplaced.

    2. The trial court erred when it instructed the jury that the
    penalty provision of MCL 600.2961(5)(b) for intentional failure to
    pay commissions is assessed each time a sales commission becomes
    due. Damages under the penalty provision in MCL 600.2961(5)(b)
    are limited to a single award of double the amount of commissions
    due but unpaid or $100,000, whichever is less.

    3. The trial court did not abuse its discretion in failing to strike
    the testimony of the plaintiff's expert witness concerning dam-
    ages. The plaintiff did not willfully fail to provide information
    regarding her expert witness, and the defendant contributed to the
    delay in the provision of information about the witness by failing

to provide the plaintiff with necessary documents. The information the expert used to render his opinion was provided by the defendant, and the plaintiff provided the expert's charts to the defendant shortly after they were completed. The trial court also gave the defendant the opportunity to depose the expert witness.

4. The trial court did not abuse its discretion, or violate MRE 611 or MCL 600.2161, when it refused to allow the defendant to recall the plaintiff as an adverse witness during the defendant's case-in-chief and required the defendant to cross-examine the plaintiff during her case-in-chief instead. The mode and order of interrogation of witnesses is within the trial court's discretion.

Award of damages for unpaid commissions affirmed, award of statutory penalties vacated, and case remanded for reduction of penalty award and recalculation of interest.

1. DAMAGES — PENALTIES — SALES COMMISSIONS.

The statutory penalty for the intentional failure to pay sales commissions when due is limited to a single award of double the amount of commissions due but unpaid or $100,000, whichever is less (MCL 600.2961[5][b]).

2. WITNESSES — ORDER OF INTERROGATION — PLAINTIFFS.

The mode and order of interrogation of witnesses is within the trial court's discretion; it is not an abuse of discretion for a trial court to require a defendant to cross-examine a plaintiff during the plaintiff's case-in-chief, rather than allowing the defendant to forgo cross-examination while the plaintiff is on the stand and recall the plaintiff as an adverse witness during the defendant's case-in-chief (MRE 611; MCL 600.2161).

*Timmis & Inman PLLC* (by *John C. Louisell* and *Michael F. Wais*) for the plaintiff.

*Kienbaum Opperwall Hardy & Pelton, P.L.C.* (by *Elizabeth Hardy* and *William B. Forrest III*), and *Day & Butler, P.L.L.C.* (by *Mark T. Butler*), for the defendant.

Before: MARKEY, P.J., and FITZGERALD and OWENS, JJ.

PER CURIAM. Defendant Applied Handling, Inc. (Applied), a Michigan corporation that sells material handling equipment to the automotive industry, appeals as

of right a judgment entered on a jury verdict in favor of plaintiff Mary Anne Linsell, a former sales representative for Applied, in this breach of contract action. The jury awarded plaintiff damages in the amount of $498,500, as well as $576,000 pursuant to the penalty provision of the Michigan sales representative commissions act (SRCA), MCL 600.2961(5)(b). The court also awarded plaintiff attorney fees and costs pursuant to MCL 600.2961(6) in the amount of $292,845.15, for a total judgment of $1,367,345.15. The judgment also provided for judgment interest until the judgment is paid, with interest of $179,961.96 owing when the judgment was entered. The trial court denied Applied's motion for judgment notwithstanding the verdict. Plaintiff cross-appeals, challenging the amount of damages awarded pursuant to the penalty provision of the SRCA.

Applied is owned by brothers Bruce and Drew Bacon. Applied hired plaintiff as a salaried marketing employee in 1987. In 1989, plaintiff moved into a salaried sales representative position. At that time, she executed a written employment contract governing the conditions under which she would receive sales commissions during and after her employment. The contract provided that "[c]ommissions will be paid on all booked business which is paid in full within the thirty (30) day notice period." Plaintiff resigned her employment in 1991, but was paid commissions on all orders received by Applied before her resignation that were paid in full by the customer within thirty days of her resignation.

At Applied's 1991 Christmas party, coowner Drew Bacon asked plaintiff to consider returning to work at Applied. In January 1992, plaintiff and her husband met with Drew at his apartment to discuss the possibility of plaintiff returning to work at Applied. Plaintiff

was reluctant to return because of what she perceived as unfairness in Applied's written policy on posttermination commissions. Plaintiff testified that

> Drew said, we will treat you—we will do things differently. I will be there for you, MAL. I will be your guardian angel and I will take care of you. I mean, we're not going to do it like we did the last time. He said, I will pay you for your sales effort.

Plaintiff further testified that Drew said that "[h]e would pay me for my sales effort that generated sales for the company. . . . [I]f I created the relationships . . . I would be compensated," whether or not the sale came in before or after she left. Drew Bacon confirmed that his conversation with plaintiff was "not a very detailed" one and that he agreed to "take care of her . . . ." He testified that he told plaintiff that he would do things differently by modifying the thirty-day policy so customers would not be required to pay within thirty days of termination in order for her to be entitled to posttermination commissions. Accordingly, unlike the other sales representatives, plaintiff would be paid commissions on all orders received by Applied before her termination at the point the customer paid. The discussion between plaintiff and Drew was not reduced to writing.

Plaintiff returned to work at Applied in March 1992, earning a sales commission of thirty-five percent.[1] Her job duties as a sales representative required her to secure orders for equipment from Ford Motor Company

---

[1] Plaintiff was generally Applied's top salesperson and earned commissions of $236,953.93 in 1995, $415,237.23 in 1996, $381,733.78 in 1997, $281,249.50 in 1998, $385,860.51 in 1999, and $415,753 for the first six months that she worked in 2000. Applied continued to pay plaintiff commissions on all orders received before her resignation, without regard to when the orders were paid by the customer. Plaintiff was paid $237,043.59 in postresignation commissions.

and Chrysler Corporation. After receiving an order, plaintiff oversaw the purchasing of the equipment and its delivery and installation at the customer's facility. Plaintiff explained that while she was the national account salesperson for Chrysler accounts, Applied became a "strategic source supplier" for Chrysler, meaning that competition was essentially eliminated and Applied became the supplier of choice for Chrysler. Plaintiff also obtained "blanket orders" for approximately 1,271 items, which meant that prices and funding were preset, and when Chrysler wanted to order an item, it merely provided a "release" for the item. Plaintiff worked two years obtaining the Chrysler blanket orders. Plaintiff also obtained a blanket order from Ford that included 130 items. Blanket orders did not become "true" orders until Ford or Chrysler provided releases for the items. Plaintiff explained that items on the blanket orders as well as sales that she expected, constituted her "pipeline." It sometimes took a year or two of work to build the pipeline before the orders started coming in. Plaintiff obtained orders from three Ford plants—Edison; Oakville, Ontario; and Kentucky —that were either shipped and delivered or in the process of being shipped at the time plaintiff resigned the second time.

Plaintiff testified that the Edison, Oakville, and Kentucky plant sales "vanished" off her sales and commission reports after she resigned and that expenses were posted to her accounts after her resignation. Bruce Bacon testified that the Edison, Oakville, and Kentucky orders were cancelled by Ford and reordered by Ford's financing company, Connell Financing. Bruce admitted, however, that none of the equipment was returned to Applied; rather, the "sold to" party was changed. In addition, some items were added to the orders.

In the late 1990s, plaintiff began experiencing health problems and was diagnosed with irritable bowel syndrome. Plaintiff was overwhelmed at work and offered to give sales representative Bob Williams fifty percent of her commission for his assistance with a project known as "GAP [Global Automotive Program] III." Plaintiff did not want to use the labor provided by Applied's operations department because she felt that this department, whose labor cost her twenty percent of her commission, did not adequately perform its job.

On July 20, 2000, after the close of business, plaintiff placed a resignation letter drafted by her attorney on Bruce Bacon's chair. She also left a note on Drew Bacon's chair informing him that she had been advised by her attorney not to speak with him or Bruce. In her resignation letter, she requested that Applied provide her with monthly accounting information so that she could track all sales for which she was the "procuring cause." The letter stated:

> Assuming Applied maintains sales and servicing of the customers/accounts procured by me, commission payments paid to me will continue indefinitely. Naturally, it is in our mutual best interest to reach an accommodation to allow a transition of my sales activity to best ensure maximum sales retention for Applied. I am prepared to discuss terms of such an accommodation with Applied or consider a negotiated buyout of Applied's future commission obligations to me if such an offer is forthcoming and fair. Please advise.

The Bacons called plaintiff's attorney, Jack Louisell, on Monday, July 24, 2000, to discuss plaintiff's offer to formulate a transition plan. On August 3, 2000, Louisell sent Bruce a proposed "Separation Agreement." The proposed agreement claimed that plaintiff was entitled to commissions indefinitely. Applied rejected the pro-

posed agreement because it exceeded the company's perception of any entitlement, and the parties continued to negotiate.

Before plaintiff's resignation, Applied used the sales code "MAL 352" for plaintiff. The sales codes identified which sales representative had responsibility for orders received and paid for by the customer. After plaintiff resigned, Bruce created a separate sales code, "MAL 353", to account for those orders Applied received after plaintiff's resignation. According to Bruce, the separate sales code allowed Applied to segregate the orders received before plaintiff's resignation from those orders received after her resignation. Applied admittedly paid $10,000 to plaintiff from the MAL 353 account for sales made after her resignation, but according to Bruce the money was paid in error. Bruce denied that he told Applied's controller, Hildegard Neumann, that plaintiff was entitled to postresignation commissions for sales generated from activity entered into the computer or business quoted by plaintiff before her resignation. Neumann testified in her deposition that according to instructions she initially received from Bruce and Drew, the money in the MAL 353 account was supposed to go "into Mary Anne's pocket." Neumann also testified that she had a discussion with Bruce after plaintiff left regarding what to pay plaintiff after she left. She testified that she understood Bruce's comments to mean that plaintiff would be paid commissions for business she generated before leaving, as well as for orders quoted before she left but entered on the computer after she left.

Bob Williams testified that he assumed responsibility for completing and servicing those sales jobs that were in process when plaintiff resigned. Drew told Williams to continue to input new sales from plaintiff's custom-

ers fifty percent to plaintiff and fifty percent to Williams. New sales were recorded by Applied on this fifty-fifty basis through September 2000. In October 2000, Applied hired sales representative Ryan Dillingham to assist Williams in finishing the work on these jobs. Applied paid Dillingham fifteen percent of the total commissions on these jobs, paid Williams sixty percent of the commissions, and put the remaining twenty-five percent into an account that was earmarked for plaintiff in the event she agreed to return and assist in the transition, as proposed in her resignation letter. This account was named the "XYZ transition account." In total, approximately $144,000[2] was deposited into the transition account.

Most of the commissions allocated to the XYZ transition account were based on a series of orders received by Applied after plaintiff's resignation as part of the program known as GAP III. Ford instituted the GAP program in 1999 in response to a number of employee injuries on its loading docks. After conducting surveys and collecting data from Ford plants across the country, Applied concluded that new loading dock equipment was necessary to prevent future accidents. Ford funded the GAP program in three phases. GAP I and GAP II occurred in 1999 and consisted of replacing "dock levelers" and installing hooking devices that locked onto trailers while loading or unloading at the dock. GAP III occurred in 2000 and involved the installation of expensive "combination control panels" at the docks. At the time plaintiff resigned in July 2000, Applied had received only a few GAP III orders. Most of the GAP III orders were received after plaintiff resigned. Williams was required to complete the servicing and installation work on those orders and to resurvey a number of the

---

[2] $144,000 represented twenty-five percent of the commissions.

plants. Applied paid plaintiff commissions on each GAP III order received before she resigned as long as the order was not subsequently cancelled. For GAP III orders received after plaintiff's resignation, Applied allocated commissions on those orders to the XYZ transition account.

Applied never reached an agreement with plaintiff on a transition plan, and plaintiff filed the present lawsuit on January 16, 2001. In her complaint, plaintiff alleged that Applied had an obligation to pay her commissions on sales she procured. At her deposition, plaintiff testified that she could not determine the amount of commissions to which she was entitled. At trial, she testified that she was leaving it up to her legal and accounting experts to look at and compile the data.

Over Applied's objection, plaintiff's damages expert, Anthony Antoun, testified that plaintiff was owed thousands of dollars in preresignation commissions dating back to 1997 as a result of misstatements of gross profits on the sales commission reports. Antoun opined that Applied had two sets of books: one for computing the commissions paid to salespeople and one for reporting gross profits on financial statements. In response to Antoun's testimony, Applied presented evidence that the "understatement" of gross profits on the sales commission reports resulted from the twenty percent routine charge that Applied uniformly imposed on projects requiring work by its operations department. Applied denied any accounting improprieties.

Antoun utilized three different approaches in calculating damages. In the first approach, he calculated that plaintiff was underpaid $872,346 for the years 1997 through 2002. Using a monthly average for sales, he applied the statutory penalty on a monthly basis and calculated damages for the years 1997 through 2002 in

the amount of $2,617,037. He also calculated future damages in the amount of $136,000 for the years of 2003 through 2005. In the second approach, Antoun calculated that plaintiff was entitled to the commissions in the XYZ transition account in the amount of $288,000. He calculated commissions on "vanishing" orders from 1997 through 2000 in the amount of $346,000, and calculated underpayments for 2001 and 2002, for a total underpayment of $923,044. Using this, he then calculated a monthly average underpayment of $12,800, applied a statutory penalty of $25,600 each month, and calculated damages of $2,764,800. He also calculated future damages of $136,000 for the years 2003 through 2005, for total damages of $2,900,800. In the third approach, he calculated underpayments of $860,348 for 1997 through 2002, and damages of $2,581,043 with the statutory penalty included. He also calculated future damages of $140,000 for 2003 through 2005, for total damages of $2,721,043.

The jury found that Applied had an oral contract with plaintiff requiring Applied to pay plaintiff sales commissions for both pre- and postresignation sales, and that Applied breached its contract with plaintiff by failing to pay plaintiff sales commissions. The verdict form asked in question number five, "What damages, if any, did Plaintiff suffer to date as a result of the breach[?]" The jury answered, "$498,500." The jury also found that plaintiff was entitled to statutory penalties under MCL 600.2961 in the amount of $576,000. After the jury was polled, the trial court granted plaintiff's counsel's request that the jury be asked, "What damages, if any, will Plaintiff suffer from today through 2005 that have not already been included in the answer to Question #5[?]" The jury was

sent to deliberate further. The jury returned the same verdict, finding that plaintiff was not entitled to future damages.

The trial court denied Applied's motions for new trial, judgment notwithstanding the verdict, and remittitur.

I

Applied argues that the trial court erred by denying its motion for judgment notwithstanding the verdict with regard to postresignation sales commissions because the evidence presented by plaintiff at trial was insufficient as a matter of law to establish mutual assent on the terms of the oral contract. Applied also contends that the alleged terms of the contract were so vague and indefinite as to be incapable of ascertainment. A trial court's decision on either a motion for judgment notwithstanding the verdict or a motion for a directed verdict is reviewed de novo, considering the evidence and all reasonable inferences in a light most favorable to the nonmoving party. *Sniecinski v Blue Cross & Blue Shield of Michigan*, 469 Mich 124, 131; 666 NW2d 186 (2003). If reasonable jurors could have reached different conclusions, the jury verdict must stand. *Central Cartage Co v Fewless*, 232 Mich App 517, 524; 591 NW2d 422 (1998).

Plaintiff clearly relied on an express oral contract, and Applied admitted there was an oral contract for employment. The dispute related to the terms of the oral contract. Indeed, defense counsel acknowledged when opposing plaintiff's motion for directed verdict that "[c]ertainly it is a jury issue as far as what the agreement of the party's [sic] was." And, in closing argument, counsel for Applied stated, "The issue in this case is what was the agreement between the parties and

did my client abide by that agreement. . . . And ladies and gentlemen of the jury the evidence is clear what the agreement was and the fact that my clients did abide by it." When the terms of a contract are contested, the actual terms of the contract are to be determined by the jury. *Guilmet v Campbell*, 385 Mich 57, 69; 188 NW2d 601 (1971).

Applied also argues that the trial court erred by denying the motion for judgment notwithstanding the verdict with regard to preresignation sales commissions because "Linsell did not allege in her complaint that Applied Handling breached a contract to pay her commissions on sales that occurred *before* her resignation." (Emphasis in Applied's brief.) Applied contends that plaintiff did not claim preresignation commissions until the eve of trial, when Antoun noticed the differences in "gross profits" between documents produced during discovery and documents Applied produced on the eve of trial.

Because the jury verdict form did not divide damages into pre- or postresignation damages, it is impossible to determine what amount of damages, if any, the jury attributed to preresignation commissions. Further, we are unable to determine how the jury calculated the damages for unpaid commissions. Nonetheless, a review of the record supports a finding that plaintiff's claim included preresignation sales commissions. Plaintiff's complaint sought recovery of all unpaid commissions. In response to Applied's motion for summary disposition, plaintiff identified preresignation sales. During discovery, plaintiff presented documentary evidence supplied by Applied with respect to preresignation sales that state "order by Mary Anne Linsell" and have job order dates before her resignation for which she was not paid. Plaintiff also presented evidence of preresignation

orders that she alleged "vanished" from her sales reports. Thus, Applied's argument that plaintiff did not claim preresignation commissions is without record support.[3]

II

Applied argues that the evidence failed to establish that plaintiff was entitled to additional commissions under the "procuring cause doctrine" or the equitable theories of unjust enrichment or equitable estoppel. It is undisputed that the jury did not determine that plaintiff was entitled to postresignation commissions under the procuring cause doctrine or these equitable theories in light of the jury's finding of an oral agreement with respect to postresignation sales commissions. Thus, this argument is misplaced and without merit.

III

Both plaintiff and Applied challenge the jury's verdict with regard to penalties under the SRCA. Applied contends that the trial court misapplied MCL 600.2961(5)(b) when it instructed the jury that the penalty is triggered and assessed against a principal each time a commission becomes "due." It contends that the SRCA provides for a single penalty of double the amount of commissions due but unpaid, up to $100,000. Plaintiff contends that the penalty damages awarded by the jury must be amended because the jury did not double the damages awarded for unpaid commissions.

---

[3] It appears that Applied is actually challenging the trial court's decision to admit the testimony of Antoun regarding the issue of gross profits. However, this argument is more thoroughly addressed in part IV of this opinion.

The SRCA, MCL 600.2961, was enacted in 1992 to provide special protection to sales representatives, with the Legislature's expressed public policy to provide significant protections for a salesperson to collect his or her commissions. *Howting-Robinson Assoc, Inc v Bryan Custom Plastics,* 65 F Supp 2d 610, 613 (ED Mich, 1999). The legislative history reveals that this law is

> an attempt by Michigan lawmakers to compensate sales agents for goodwill and other assets lost that would be difficult to quantify in a dispute. Thus, rather than requiring the harmed agents to resort to costly litigation to provide the detailed accounting necessary to ascertain all relevant damages, the legislature simply chose to assess those additional damages by requiring a principal who intentionally fails to pay commissions due to remit two times that amount to the agent. [*M & C Corp v Erwin Behur GmbH & Co, KG,* 87 F3d 844, 850 (CA 6, 1996).]

To achieve that end, the Legislature included heavy penalties against violating principals to ensure that sales representatives in Michigan are paid the full commissions to which they are entitled, especially when those commissions fall due after the termination of the employment relationship. *Walters v Bloomfield Hills Furniture,* 228 Mich App 160, 164; 577 NW2d 206 (1998).

MCL 600.2961 provides in pertinent part:

> (2) The terms of the contract between the principal and sales representative shall determine when a commission becomes due.

> \* \* \*

> (4) All commissions that are due at the time of termination of a contract between a sales representative and principal shall be paid within 45 days after the date of termination. Commissions that become due after the ter-

mination date shall be paid within 45 days after the date on which the commission becomes due.

(5) A principal who fails to comply with this section is liable to the sales representative for both of the following:

(a) Actual damages caused by the failure to pay the commissions when due.

(b) If the principal is found to have intentionally failed to pay the commission when due, an amount equal to 2 times the amount of commissions due but not paid as required by this section or $100,000, whichever is less.

The primary goal of statutory interpretation is to ascertain and give effect to the Legislature's intent. The Legislature is presumed to have intended the meaning it plainly expressed. If the plain and ordinary meaning of the statutory language is clear, then judicial construction is neither necessary nor permitted. A court is required to enforce a clear and unambiguous statute as written. *Smith v Globe Life Ins Co,* 223 Mich App 264, 276-277; 565 NW2d 877 (1997), rev'd in part on other grounds 460 Mich 446 (1999).

Applied argues that the trial court misapplied MCL 600.2961(5)(b) when it instructed the jury that the penalty is triggered and assessed against a principal each time a commission becomes "due." Applied contends that MCL 600.2961(5)(b) "plainly states that the penalty consists of 'an amount' (singular) that is equal to double 'the amount of [unpaid] commissions' (plural) or $100,000, whichever is less." It argues that the penalty applies once to all unpaid commissions in the aggregate, not separately to each unpaid commission.

The only case to directly address the proper assessment of damages under the SRCA for intentional failure to pay commissions is *Kenneth Henes Special Projects Procurement, Marketing & Consulting Corp v Continental Biomass Industries, Inc,* 86 F Supp 2d 721 (ED Mich,

2000). Although decisions of a federal district court interpreting Michigan law are not precedent binding on Michigan courts, *Ryder Truck Rental, Inc v Auto-Owners Ins Co, Inc*, 235 Mich App 411, 416; 597 NW2d 560 (1999), courts may find the reasoning of the federal court persuasive. In *Kenneth Henes*, the plaintiff brought suit under the SRCA to recover unpaid commissions "due and owing" as a result of sales of equipment that it procured. The jury found that the plaintiff was owed commissions on four sales: $12,493 on a December 1996 sale; $35,000 on a June 1997 sale; $50,200 on a May 1998 sale; and $37,500 on a 1998 sale, for total commissions owing of $135,193. The jury also found that the defendant intentionally failed to pay the sales commissions. *Kenneth Henes, supra* at 723. The trial court doubled the damages for intentional failure to pay three of the sales commissions, and entered a verdict of $257,493 in favor of the plaintiff as follows:

> Ct. 1: $12,493.00
>
> Ct. 2: $70,000.00 ([June 1997] sale jury verdict of $35,000 x 2)
>
> Ct. 3: $100,000.00 (applying the statutory double commissions cap to the [May 1998] sale)
>
> Ct. 4: $75,000.00 ([the other 1998] sale jury verdict of $37,500 x 2) [*Id.* at 723-724.]

The defendant moved for a new trial and amendment of the judgment, arguing in relevant part that the $100,000 cap on double commissions provided in MCL 600.2961(5)(b) is a cap on doubling commissions as a penalty in the aggregate, and not a cap for the penalty on each commission. Therefore, the defendant claimed that the correct calculation of damages should begin with the total amount of commissions that the jury found to be owing to the plaintiff on all counts ($135,193)

and, since doubling the intentionally withheld commissions in the aggregate would exceed $100,000, the plaintiff would be entitled to only an additional $100,000 penalty, not the additional $122,300 penalty reflected in the judgment entered by the court. *Kenneth Henes, supra* at 724-725, 733-734.

The plaintiff also moved to amend the judgment, arguing that it was entitled to more than the $257,493 reflected in the judgment. The plaintiff contended that the cap in MCL 600.2961(5)(b) applies separately to each unpaid commission and, therefore, it was entitled to recover on each of the three commissions the amount the jury awarded *plus* either an amount equal to twice that commission or $100,000, whichever was less. The plaintiff argued that the judgment should have been for $380,193.[4] *Kenneth Henes, supra* at 725, 734.

The federal district court concluded that the judgment should reflect an award of all actual damages assessed by the jury, plus a single statutorily capped penalty award under MCL 600.2961(5)(b) of $100,000. Noting that no court had squarely addressed the issue of the proper application of the double commission penalty provision in MCL 600.2961(5)(b), or its attendant $100,000 cap, the court observed that "the Sixth

---

[4] The plaintiff calculated the damages award as follows:

Jury verdict on the December 1996 sale: $12,493

Jury verdict on the June 1997 sale: $35,000
Penalty: $70,000

Jury verdict on the May 1998 sale: $50,200
Penalty: $100,000

Jury verdict on the other 1998 sale: $37,500
Penalty: $75,000

Total: $380,193

Circuit [in *Kingsley Assoc, Inc v Moll PlastiCrafters, Inc*, 65 F3d 498 (CA 6, 1995)] has at least implicitly ruled on this issue and has concluded that the proper assessment of damages for intentional failure to pay commissions is an award of the actual damages sustained by the plaintiff plus a single double commissions penalty capped at $100,000." *Kenneth Henes, supra* at 734.

*Kingsley* involved a sales representative's claims of breach of contract and violation of the SRCA arising out of the defendant's failure to pay commissions. *Kenneth Henes* quoted the following from the *Kingsley* decision:

> "As the jury has already made a finding that Moll Plasti Crafters intentionally failed to pay Kinglsey its commissions due, *Kingsley is hereby awarded in addition to its actual damages **an amount** [singular] equal to twice the amount of commissions [plural] due but not paid, **not to exceed $100,000** . . . .*" [*Kenneth Henes, supra* at 735, quoting *Kingsley, supra* at 508 (emphasis added by *Kenneth Henes*).]

The *Kenneth Henes* court then stated:

> As indicated, the Sixth Circuit assessed *one single penalty* of double the amount of commissions due *up to $100,000* in addition to the actual damages sustained by the plaintiff. *See also, H.J. Tucker & Associates, Inc. v. Allied Chucker and Engineering Company*, 234 Mich.App. 550, 595 N.W.2d 176 (1999), in which the Michigan Court of Appeals stated that Section 2961 provides for an award of actual damages plus "an additional award of two times the amount of commissions due, not to exceed $100,000." [234 Mich App at 555] 595 N.W. 2d at 180. [*Kenneth Henes, supra* at 735 (emphasis in original).]

The *Kenneth Henes* court also noted:

> This construction further appears to be consistent with the Michigan Legislature's apparent desire to enact a sales representative commissions statute that would "bring Michigan into line with most of its surrounding states, which reportedly have a similar law." Kentucky, Wisconsin, Pennsylvania, Ohio and South Carolina all have statutes which, are perhaps a bit more artfully drafted that [sic] the Michigan statute, and these states' statutes make it clear that for "intentional failure to pay," a *single* maximum penalty *in addition to actual commissions due* is assessed. [*Id.* (emphasis in original; citation omitted).]

The court then granted the defendant's motion for amendment of judgment to reflect the jury verdict of $135,193, plus an additional $100,000 pursuant to MCL 600.2961(b)(5) for intentional failure to pay commissions, for a total damage award of $235,193. *Kenneth Henes, supra* at 735-736.

Plaintiff relies on *H J Tucker & Assoc, Inc v Allied Chucker & Engineering Co*, 234 Mich App 550; 595 NW2d 176 (1999), in support of her position that the double-damages provision applies to each commission as it becomes due.[5] In *Tucker*, this Court concluded that claims for payments due under contracts for commissions are analogous to claims for payments under an installment contract. Thus, for purposes of determining whether a claim under the SRCA is viable or barred by the statute of limitations, this Court concluded that it is appropriate to compare monthly commission obligations to installment contracts. *Id.* at 562-563. Plaintiff argues that the same construction must be applied to the statutory penalty provision and that "the statutory

---

[5] Plaintiff also cites *Peters v Gunnell*, 253 Mich App 211; 655 NW2d 582 (2002), and *M & C Corp, supra.* However, neither case considered the issue of multiple penalties under the SRCA.

penalty provision must apply each and every time periodic unpaid commissions become due and are intentionally not paid." Under this construction, plaintiff contends that the penalty award must be amended because the jury did not "double" the damages awarded for unpaid commissions. She contends that the penalty award should have been $997,000 ($498,500 doubled).[6]

The holding in *Tucker* did not involve the interpretation of the double-damages provision of MCL 600.2961(5)(b). Rather, the language in *Tucker* cited by plaintiff dealt solely with whether the plaintiff's breach of contract claim was barred by the statute of limitations. Interestingly, the verdict of $1.2 million in *Tucker* was based on the failure to pay monthly commissions over a six-year period, yet the trial court awarded the plaintiff a single SRCA penalty capped at $100,000.[7] No issue regarding the propriety of the SRCA penalty was presented in *Tucker*. Thus, the decision in *Tucker* is not controlling with regard to the issue presented in this case.

The language in MCL 600.2961 is ambiguous; therefore, judicial interpretation is permissible. We agree with the reasoning in *Kenneth Henes*, however, and adopt it as our own: damages pursuant to the penalty provision in MCL 600.2961(5)(b) are limited to a single

---

[6] It is impossible to determine how the jury determined the amount of damages for unpaid commissions and penalties. However, because the amount of commissions placed in the XYZ transition account was $144,000, and because this amount represented only fifty percent of the amount of commissions plaintiff claimed she was entitled to, it appears that the jury doubled the $288,000 in commissions due from the XYZ transition account to determine the amount of the penalty.

[7] The facts concerning the *Tucker* award are taken from the lower court judgment in that case, a copy of which was attached to Applied's brief on cross-appeal.

award of double the amount of commissions due but unpaid or $100,000, whichever is less.

IV

Applied asserts that it is entitled to a new trial because the trial court abused its discretion by failing to strike Antoun as an expert witness because plaintiff failed to seasonably supplement interrogatory answers regarding her expert witness. This Court reviews for an abuse of discretion a trial court's decision with regard to whether to impose discovery sanctions. *Bass v Combs*, 238 Mich App 16, 26; 604 NW2d 727 (1999).

A party who has responded to a discovery request with a response that was complete when made has a duty to seasonably supplement the response when the subject matter of the request is expert testimony. MCR 2.302(E)(1)(a)(ii). If the party fails to seasonably supplement the response, the trial court may enter an order that is just, including sanctions. MCR 2.302(E)(2); MCR 2.313(B)(2)(b). However, because sanctions are discretionary, the trial court must carefully consider the circumstances of the case before it. In denying Applied's motion to strike Antoun's testimony, the trial court concluded that Applied was not prejudiced because the documents that formed the basis of Antoun's testimony were supplied by Applied:

> And to say on the eve of or on the day of trial we have been sandbagged because somebody has placed on charts our information and it should have been contained in supplemental responses to interrogatories is not, in my opinion, the—does not compel this Court to strike Mr. Antoun as an expert witness.
>
> I'm not going to adjourn trial. If you want to depose Mr. Antoun during the course of this trial I have every expectation that this trial is going to take a couple of weeks.

There is no indication that plaintiff willfully failed to provide information regarding Antoun. Rather, Applied contributed to the delay by failing to provide plaintiff with the documents necessary for Antoun to render an opinion. See, e.g., *Middleton v Margulis*, 162 Mich App 218, 223-224; 412 NW2d 268 (1987). Further, the information used to render Antoun's opinion and to calculate damages was provided by Applied. And the record reveals that plaintiff provided Applied with the expert's charts shortly after they were completed. The trial court gave Applied the opportunity to depose Antoun. These circumstances do not warrant the striking of plaintiff's expert witness, and the trial court did not abuse its discretion in refusing to impose this sanction.

v

Applied asserts that it is entitled to a new trial because the trial court erred by refusing to allow Applied to call plaintiff as a witness during Applied's case-in-chief. The mode and order of interrogation of witnesses is within the trial court's discretion. *Phillips v Mazda Motor Mfg (USA) Corp*, 204 Mich App 401, 415; 516 NW2d 502 (1994).

Plaintiff's witness list included witnesses also named on Applied's witness list. At the beginning of trial, the court stated that Applied's counsel could question witnesses taking the stand during plaintiff's case-in-chief either during plaintiff's case or during Applied's case, but not both. Applied deferred cross-examination of several witnesses called by plaintiff during her case-in-chief and instead called those witnesses during Applied's case-in-chief.

Plaintiff took the stand during her case-in-chief. At the conclusion of her direct examination, Applied's counsel indicated that he would not cross-examine

plaintiff, but would wait and call her during Applied's case-in-chief. Plaintiff's counsel objected, and the trial court ruled:

> I never allow the Plaintiff to be called again in the defense's case once that Plaintiff has testified on the stand. Plaintiff was on the stand, direct and then cross examination, while that person is on the stand. I do not have the Plaintiff step down and then recalled in the Defendant's case.

When asked by Applied's counsel why the trial court was changing its position from that previously announced regarding the examination of witnesses, the court explained, "I meant with respect to your people, your witnesses, your Defendants and any experts you might call. I never intended that to be true with respect to the Plaintiff."

Applied cross-examined plaintiff after her direct testimony. Applied now argues on appeal that it was prejudiced by the trial court's ruling because the ruling prevented Applied from questioning plaintiff about the testimony of witnesses who followed her. Specifically, Applied argues that it "could not directly confront Linsell about Antoun's fraud allegations."

Applied acknowledges that a trial judge has discretion to manage a trial, and that MRE 611(a) provides that a trial judge shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence at trial. MRE 611 provides:

> (a) *Control by court.* The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

(b) *Scope of cross-examination.* A witness may be cross-examined on any matter relevant to any issue in the case, including credibility. The judge may limit cross-examination with respect to matters not testified to on direct examination.

(c) *Leading questions.*

(1) Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony.

(2) Ordinarily leading questions should be permitted on cross-examination.

(3) When a party calls a hostile witness, an adverse party or a witness identified with an adverse party, interrogation may be by leading questions. It is not necessary to declare the intent to ask leading questions before the questioning begins or before the questioning moves beyond preliminary inquiries.

Applied cites MCL 600.2161, the adverse witness statute, which provides:

In any suit or proceeding in any court in this state, either party, if he shall call as a witness in his behalf, the opposite party, employee or agent of said opposite party, or any person who at the time of the happening of the transaction out of which such suit or proceeding grew, was an employee or agent of the opposite party, shall have the right to cross-examine such witness the same as if he were called by the opposite party; and the answers of such witness shall not interfere with the right of such party to introduce evidence upon any issue in such suit or proceeding, and the party so calling and examining such witness shall not be bound to accept such answers as true.

Then, without citing any Michigan authority, Applied argues that "[c]alling the plaintiff as an adverse witness in the defendant's case is routine." Applied states that "[c]ourts in other states that have addressed this issue under equivalent rules, have held that it is reversible

error for the trial court to refuse the defendant's request to recall the plaintiff during the defendant's case-in-chief." Applied cites *Loftin v Morgenstern,* 60 So 2nd 732 (Fla, 1952), and *Ohr v Ohr,* 30 Colo App 540; 495 P2d 1156 (1972), in support of this proposition. Both cases relied on former FR Civ P 43(b), and like rules adopted in a number of states, to the extent that rule is concerned with calling an adverse party as a witness. FR Civ P 43(b) provided:

> A party may interrogate any unwilling or hostile witness by leading questions. A party may call an adverse party or an officer, director, or managing agent of a public or private corporation or of a partnership or association which is an adverse party, and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party, and the witness thus called may be contradicted and impeached by or on behalf of the adverse party also, and may be cross-examined by the adverse party only upon the subject matter of his examination in chief.

However, in § 3 of PL 93-595 (enacted January 2, 1975), Congress approved a Supreme Court amendment abrogating FR Civ P 43(b). FRE 611 now governs the interrogation of witnesses and provides:

> (a) Control by court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

> (b) Scope of cross-examination. Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.

(c) Leading questions. Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.

MRE 611 is Michigan's counterpart to FRE 611.

The purpose of MCL 600.2161 is to permit calling the opposite party, or his agent or employee, as a witness with the same privileges of cross-examination and contradiction as if the opposite party had called that witness. See *Kovich v Church & Church, Inc*, 267 Mich 640, 644; 255 NW 421 (1934). Neither MRE 611 nor MCL 600.2161 was violated when the trial court exercised its discretion under MRE 611(a) and required Applied to cross-examine plaintiff during plaintiff's case-in-chief, rather than allowing Applied to forgo cross-examination while plaintiff was on the stand during her case-in-chief and recall the plaintiff as an adverse witness during Applied's case-in-chief.

The award of damages for unpaid commissions is affirmed. The award of statutory penalties under the SRCA is vacated, and the case is remanded to the trial court. On remand, the trial court shall reduce the award of statutory penalties to $100,000 and recalculate the interest accordingly. Jurisdiction is not retained.